Mark A. Echo Hawk (Idaho State Bar # 5977)
Patrick J. Davis (Idaho State Bar # 9702)
Echo Hawk & Olsen, PLLC
505 Pershing Ave., Ste. 100
Pocatello, Idaho 83205-6119
Telephone: (208) 478-1624
Facsimile: (208) 478-1670
mark@echohawk.com
patrick@echohawk.com
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DANIEL C. ARRIWITE,<br><br>        Plaintiff,<br><br>vs.<br><br>SME STEEL CONTRACTORS, INC., a Utah Corporation; SME John Does I-V.<br><br>        Defendant. | Case No.: 4:18-cv-00543<br><br>**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL** |

COMES NOW Plaintiff Daniel C. Arriwite (hereinafter "Mr. Arriwite"), by and through counsel of record, ECHO HAWK & OLSEN, PLLC, and for causes of action against Defendant SME Steel Contractors, Inc., a Utah corporation licensed to do business in Idaho ("SME"), complains and alleges as follows:

**I.     NATURE OF ACTION**

1.     Mr. Arriwite was a welder employed by SME up until July 3, 2015. Mr. Arriwite, now 64 years of age, had intended to work for SME until he reached full retirement at age 67. Mr. Arriwite suffered wrongful termination, retaliation in the workplace, loss of wages, and mental and emotional distress at the hands of the SME. Because of the foregoing, Mr. Arriwite was forced to take early retirement at the age of 62 in order to maintain a living income for his

family. This is an action to recover damages caused by the retaliatory and negligent conduct of SME.

## II.   PARTIES, JURISDICTION, AND VENUE

2. Mr. Arriwite is, and was at all relevant times, a resident of Bannock County, Idaho.

3. SME is a Utah corporation licensed to do business in Idaho, with locations in southeast Idaho and specifically in Pocatello, Bannock County, Idaho.

4. SME John Does I to V are individuals whose identities are currently unknown, but who may have participated in the acts complained of herein or contributed to injuries sustained by Mr. Arriwite.

5. Mr. Arriwite has suffered damages in excess of $300,000.00 dollars, exclusive of interest and costs, in a precise amount to be proved at trial.

6. This Court has jurisdiction pursuant to 28 U.S.C. § 1332, and 29 U.S.C. § 660(c).

7. Venue for this action is proper.

## III.   GENERAL ALLEGATIONS

**A.   JULY 1, 2015**

8. On Wednesday, July 1, 2015 while preparing to weld materials for the Chumash Hotel & Casino Project, Mr. Arriwite was approached by SME employee Ray Carlson who instructed Mr. Arriwite to move to a different heavy piece of material that Mr. Arriwite could see had been partially welded by night-shift SME employees.

9. Ray Carlson instructed Mr. Arriwite to finish welding this piece of material.

10. Mr. Arriwite immediately observed that the piece Ray Carlson had directed him to weld was being welded with UltraCore 70C – Lincoln Electric Wire ("70c").

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 2

11. Based on his knowledge and experience in the welding industry, Mr. Arriwite knew 70c to be a dangerous material that required multiple additional safety measures and equipment in order to safely use under guidelines set forth by the Occupational Safety and Health Administration within the U.S. Department of Labor (hereinafter "OSHA"); equipment otherwise known as PPE in OSHA terms (Proper Protective Equipment). Further, Mr. Arriwite knew many of the potential physical effects a welder can experience when using 70c, including but not limited to serious neurological damage.

12. Mr. Arriwite could not see any of the safety measures or equipment he knew to be required for use of 70c in the area and asked Ray Carlson and SME employee Billy Severs where the PPE was in order to safely do the task Ray Carlson had just given him.

13. Mr. Arriwite further informed both Ray Carlson and Billy Severs that 70c is a dangerous material and outlined the proper precautions that must be taken when using it.

14. Mr. Arriwite was informed he would be provided with a fan and paper mask, which he knew to be wholly inadequate to protect against the dangers posed by 70c, and informed Mr. Carlson and Mr. Severs of this fact.

15. Mr. Carlson's response was that all welding is dangerous on some level but did not directly address the concerns Mr. Arriwite raised.

16. Mr. Arriwite responded by detailing a number of the potential injuries that can occur to a welder who uses 70c without proper precautions and equipment, including damage to the nervous system.

17. Mr. Arriwite further stated to Billy Severs that he had previously been working on the Chumash Project, whereupon Billy Severs instructed Mr. Arriwite to return to working on the Chumash Project.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 3

18. Later, Mr. Arriwite was approached again by Ray Carlson who told Mr. Arriwite that there was nothing further for him to do that day and to go home.

**B.     JULY 2, 2015**

19. On Thursday, July 2, 2015, Mr. Arriwite arrived at work at 6:00 a.m. and began preparing to perform further work on the Chumash Project when he was approached by a Fitter Welder and a novice welder who stated that they needed to exchange welding machines with Mr. Arriwite because of an issue with the novice's welder regarding length and reach of hoses.

20. Mr. Arriwite stated that the exchange was unnecessary, and that Mr. Arriwite had previously used the machine in question and the length and reach of hoses did not limit his ability to weld.

21. A short time later Ray Carlson approached Mr. Arriwite and instructed him to exchange welding machines with the novice welder.

22. Mr. Arriwite explained that he needed his machine for the work he was performing and again explained that the machine being used by the novice welder was adequate for the task the novice welder was performing.

23. Ray Carlson became irate and began screaming obscenities and threats at Mr. Arriwite.

24. Ray Carlson then physically grabbed Mr. Arriwite by his shirt and pulled him toward himself.

25. Mr. Arriwite told Ray Carlson not to touch him and reminded him of a time previously at another company where both Mr. Arriwite and Ray Carlson had been employed when Ray Carlson was terminated for workplace violence.

26. Ray Carlson instructed Mr. Arriwite to follow him to the office and simply stated,

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 4

"Insubordination," without elaborating further.

27. Mr. Arriwite followed Ray Carlson to the main office where Ray Carlson told Mr. Arriwite was going to be written up for insubordination.

28. Upon entry to the main office, Mr. Arriwite saw that Billy Severs and SME employee Dave Burgess were already there with the Fitter Welder who had earlier approached Mr. Arriwite, and they appeared to be waiting for Mr. Arriwite.

29. Dave Burgess, whose role with SME at this time was Human Resource Director, pointed his finger at Mr. Arriwite and told him that he was giving him a direct order to go out onto the floor and commence welding with 70c, and that it was safe to do so.

30. Mr. Arriwite asked whether he was going to be fired for refusing to weld with an unsafe material in unsafe conditions. Mr. Arriwite also stated, "Dave, that sounds like a safety question. Maybe I ought to call OSHA."

31. Billy Severs presented Mr. Arriwite with the Material Safety Data Sheet (hereinafter "MSDS") for 70c, upon which Mr. Arriwite explained that the information on the MSDS was inadequate and that the manufacturer's warning label on the actual boxes full of 70c wire and accompanying data is what had a more complete description of the hazards of 70c.

32. Mr. Arriwite further stated that as of July 2015, OSHA required use of the manufacturer's warning label, and not the MSDS.

33. Mr. Arriwite was instructed that SME did not follow the manufacturer warning on the boxes of 70c.

34. Billy Severs then informed Mr. Arriwite that there was nothing for him to do there that day, and to go home.

35. Mr. Arriwite immediately traveled to the Shoshone-Bannock Tribes' Tribal

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 5

Employment Rights Office ("TERO") on the Fort Hall Reservation.

36. Mr. Arriwite instructed the TERO Safety Compliance Officer, Chris Hugues, whose background was in OSHA safety compliance, that he believed he would be terminated the following day for raising the issue of OSHA compliance with his superiors at SME.

37. Together with the Chris Hugues, Mr. Arriwite created a report of OSHA violations and faxed that report to both the Boise OSHA office and the Region 10 OSHA Office in Seattle to report the use of 70c wire by SME under unsafe working conditions.

**C.   JULY 3, 2015**

38. On Friday, July 3, 2015, Mr. Arriwite arrived at work at 6:00 a.m. and began preparing to perform further work for the Chumash Project, which had been laid out for him by the previous shift at his work station.

39. Shortly thereafter Mr. Arriwite was approached by Ray Carlson again who directed Mr. Arriwite to follow him to the office, which Mr. Arriwite did.

40. Upon entry to the office, where again Billy Severs was waiting for Mr. Arriwite, Billy Severs said to Mr. Arriwite, "We're going to have to let you go, do you have a problem with that?"

41. Mr. Arriwite responded by asking Billy Severs whether SME would contest unemployment, and Billy Severs responded that SME would not contest Mr. Arriwite's right to receive unemployment benefits.

42. Mr. Arriwite then accepted SME's decision and immediately left the premises and filed a request for an unemployment benefit award with the Idaho Department of Labor.

43. On July 14, 2015 Mr. Arriwite filed a whistleblower's claim with OSHA within the U.S. Department of Labor.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 6

44. On July 15, 2015 the United States Department of Labor, Occupational Safety and Health Administration ("OSHA") investigated Mr. Arriwite's allegations of an unsafe environment against SME. Upon information and belief, this investigation was announced to SME by OSHA before it was conducted and revealed no safety violations, as SME concealed their unsafe practices prior to OSHA investigators' arrival.

45. When Mr. Arriwite learned from former colleagues that SME had concealed its unsafe practices from OSHA investigators, Mr. Arriwite faxed a letter to OSHA in Boise, informing them of that fact. Upon information and belief, receipt of Mr. Arriwite's letter initiated a second, this time unannounced, investigation, that yielded several safety violations.

46. After the second investigation, OSHA cited SME for a violation of 29 CFR 1910.134(c)(1) because respiratory equipment was optional rather than required when welding with 70c, which emits dangerous fumes. OSHA designated this violation as SERIOUS and proposed a fine of $7,000.00.

47. OSHA cited SME for a violation of 29 CFR 1910.134(d)(1)(iii) because ventilation was inadequate where 70c was being used and welders were exposed to a level of contaminants in excess of the Permissible Exposure Limit ("PEL") for iron fumes, manganese fumes, and copper fumes. OSHA designated this violation as SERIOUS.

48. OSHA cited SME for a violation of 29 CFR 1910.134(d)(2)(i) specifically because welders were exposed to fumes emitted by 70c at 169% of the PEL. OSHA designated this violation as SERIOUS and proposed a fine of $7,000.00.

49. OSHA cited SME for a violation of 29 CFR 1910.1000(e) because no attempt at achieving permissible exposure levels had been conceived or implemented, and welders were exposed to 169% PEL of manganese fumes and iron oxide fumes. OSHA designated this

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 7

violation as SERIOUS.

50. OSHA cited SME for a violation of 29 CFR 1910.1200(h)(1) because employees welding with 70c had not been properly trained and educated as to the harmful effects, or the target organs that could be damaged by exposure. OSHA designated this violation as SERIOUS.

51. For each of the foregoing violations, OSHA issued the citation on November 10, 2015 and required SME to provide Abatement Certification and documentation of that fact no later than December 8, 2015.

52. SME later entered a settlement agreement in the US Occupational Safety and Health Review Commission (Docket No. 15-2179) for reduced penalties and stricter respiratory protection requirements and inspections.

53. Mr. Arriwite requested the opportunity to participate in the Occupational Safety and Health Review Commission proceeding (Docket No. 15-2179) prior to settlement but was not allowed to do so.

54. On March 31, 2016 OSHA responded for the first time to Mr. Arriwite's whistleblower claims and assigned regional supervisory investigator Tobias Kammer to investigate Mr. Arriwite's claims for retaliatory termination.

55. On January 15, 2018 OSHA issued its decision in a letter to Mr. Arriwite, without elaboration or setting forth findings of fact.

56. Despite the overwhelming evidence to the contrary, Tobias Kammer determined that Mr. Arriwite had not been terminated for refusing to work in dangerous conditions or reporting those conditions to OSHA. Mr. Arriwite appealed that determination, which appeal is still pending.

57. On May 17, 2018, after counsel for Mr. Arriwite inquired as to the status of the

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 8

appeal by contacting Tobias Kammer. The next day a letter dated May 14, 2018 arrived from Francis Yebesi, Acting Director, Directorate of Whistleblower Protection Programs for OSHA, informing Mr. Arriwite that there was insufficient evidence to support that SME terminated Mr. Arriwite for reporting safety violations to OSHA.

### IV.   FIRST CLAIM FOR RELIEF
### WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

58.    Mr. Arriwite re-alleges and incorporate all preceding paragraphs as if set forth herein.

59.    Although Idaho is an at-will employment state, while non-contract employees may be terminated at any time for any reason, public policy dictates that employees not be terminated in connection with engaging in activities that are in the public interest.

60.    It is in the public interest for Idaho employees to not be required to work under dangerous and harmful working conditions.

61.    SME's failure to provide proper safety equipment appropriate for the work it asked Mr. Arriwite to perform forced Mr. Arriwite to choose between his own personal safety and obeying the wishes of SME.

62.    Mr. Arriwite was then punished by SME both for refusing to work under dangerous and harmful conditions and for reporting those same conditions to OSHA when he was terminated immediately after making the report.

63.    Failure to provide a safe and secure work environment and terminating Mr. Arriwite for reporting unsafe conditions as well as refusing to work under them constituted wrongful termination of Mr. Arriwite in contravention of public policy, which termination was the direct and proximate cause of the loss of Mr. Arriwite's job with its pay and benefits, and

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 9

which caused him to suffer mental and emotional distress, embarrassment, humiliation, and lost wages in amounts to be proven at trial.

### V.     SECOND CAUSE OF ACTION
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

64.     Mr. Arriwite re-alleges and incorporates all preceding paragraphs as if set forth herein.

65.     At all times material to this action, SME, its agents and employees owed Mr. Arriwite a duty to exercise reasonable care in avoiding exposing him to a dangerous and harmful work environment and terminating him for refusing to endanger himself and reporting SME's failures.

66.     SME also owed Mr. Arriwite a duty to avoid creating, facilitating, or allowing a hostile work environment.

67.     SME owed Mr. Arriwite a duty to exercise reasonable care to avoid causing emotional distress.

68.     SMEs, by its negligent and intentional conduct, breached its duties to Mr. Arriwite, causing him to suffer severe emotional distress.

69.     SME's act of insisting that Mr. Arriwite subject himself to a dangerous and harmful work environment, as well as its termination of Mr. Arriwite for reporting the dangerous and harmful work environment created by SME, caused Mr. Arriwite to suffer severe emotional distress.

70.     As a direct, proximate and foreseeable result of the actions and omissions of SME, as set forth above, Mr. Arriwite has suffered, and continues to suffer, severe emotional distress, including physical manifestations of distress, sleep disorders, mood swings, anxiety, loss of self-esteem, and depression, in a precise amount to be proved at trial.

## VI. THIRD CAUSE OF ACTION
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

71. Mr. Arriwite re-alleges and incorporates all preceding paragraphs as if set forth herein.

72. SME, by and through its employees, has by its conduct, acts and omissions, breached its duty of good faith and fair dealing it owes to Mr. Arriwite.

73. SME owed Mr. Arriwite an implied contractual duty of good faith and fair dealing.

74. SME's actions and omissions violated, nullified, and/or impaired the benefits and rights Mr. Arriwite had as an employee of SME.

75. SME failed to take reasonable measures to ensure that Mr. Arriwite obtained the benefits of employment.

76. As a result of SME's breach of its duty of good faith and fair dealing, Mr. Arriwite has suffered damages in an amount to be proved at trial.

## VII. FOURTH CAUSE OF ACTION
## WRONGFUL DISCHARGE AND DISCRIMINATION IN VIOLATION OF 29 U.S.C. § 660(c)

77. Mr. Arriwite re-alleges and incorporates all preceding paragraphs as if set forth herein.

78. SME staff insisted Mr. Arriwite put himself in danger by demanding that he weld with 70c despite being informed of health risks of welding with 70c wire.

79. Mr. Arriwite indicated to SME staff his willingness and intention to report their activities to OSHA, unless provided with appropriate PPE.

80. Mr. Arriwite did report to OSHA the fact that SME did not have PPE that would enable employees to safely use 70c without being exposed to harmful side-effects.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 11

81. Mr. Arriwite was first bullied and physically battered by SME staff after reporting SME's dangerous working conditions.

82. Mr. Arriwite was then discharged because he reported SME's dangerous working conditions to OSHA.

83. SME had a duty, pursuant to 29 U.S.C. 660(c), not to discharge or otherwise discriminate against him for having reported SME's dangerous working conditions to OSHA.

84. SME breached its duty under 29 U.S.C. 660(c) by its conduct against Mr. Arriwite, including his termination.

85. As a direct and proximate cause of SME's conduct, Mr. Arriwite suffered damages.

## VIII.  PRAYER FOR RELIEF

86. Mr. Arriwite has been required to retain the law firm of Echo Hawk & Olsen, PLLC to represent him in this matter and is entitled to recover attorney fees and costs for said representation.

87. Mr. Arriwite alleges that $5,000.00 constitutes reasonable attorney fees should this matter be uncontested, and should SME allow a Default Judgment to be entered against it, and a sum greater if this matter is contested.

WHEREFORE, Mr. Arriwite prays for relief as follows:

A. For Judgment against SME for Mr. Arriwite's claims of wrongful termination, negligent and intentional infliction of emotional distress, and for an award of the following damages:

    1. Compensatory damages in an amount to be proven at trial for Mr. Arriwite's mental and emotional distress, embarrassment, humiliation, and loss of his job;

    2. Lost wages in amounts to be proved at trial;

    3. Back pay, including overtime pay, pension benefits, commissions, and other benefits which Mr. Arriwite would have received had he not been retaliatorily discharged by SME in amounts to be proved at trial;

    4. For an award of front pay in an amount to be determined at trial.

  B. For Judgment against SME for its employees' negligent and/or intentional infliction of emotional distress and for an award of compensatory damages for Mr. Arriwite's emotional distress, mental suffering, embarrassment, humiliation, loss of job, and wage loss caused by SME's employees conduct in amounts to be proved at trial.

  C. Reasonable attorneys' fees, expert witness fees, and costs of suit pursuant to Idaho Code § 67-5908.  In the event this matter is uncontested, and the SME allows Judgment to be entered against them, Mr. Arriwite prays for a reasonable attorney's fee in the amount of $5,000.00.

  D. For pre-judgment and post judgment interest at the highest rates permitted by law.

  E. For such other and further relief as the Court deems just and proper.

///

///

///

///

## VIII. DEMAND FOR JURY TRIAL

Mr. Arriwite demands a trial by jury, composed of no less than twelve (12) persons, on all issues and claims so triable, pursuant to the constitutions and laws of the United States and the State of Idaho.

DATED this 23rd day of October, 2018.

                                            ECHO HAWK & OLSEN, PLLC

                                            /s/ Patrick J. Davis
                                            *Attorneys for Plaintiff*

| | |
|---|---|
| STATE OF IDAHO | ) |
| | )ss. |
| County of Bannock | ) |

DANIEL C. ARRIWITE, being first duly sworn, deposes and says:

That he is the Mr. Arriwite herein; that he has read the foregoing document, knows the contents thereof, and that the facts therein stated are true to the best of him knowledge and belief.

                                            /s/ Daniel C. Arriwite
                                            DANIEL C. ARRIWITE

SUBSCRIBED AND SWORN TO before me this 23rd day of October, 2018.

                                            /s/ Eric L. Olsen
(SEAL)                                Notary Public for Idaho
                                            Residing at: Pocatello, ID
                                            Commission expires: 12/18/2018