UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DANIEL C. ARRIWITE,<br><br>   Plaintiff,<br><br>   v.<br><br>SME STEEL CONTRACTORS, INC.,<br>SME John Does I-V,<br><br>   Defendants. | Case No. 4:18-cv-00543-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court are Defendant SME Steel Contractors, Inc.'s ("SME") Motion in Limine (Dkt. 56) and Plaintiff Daniel Arriwite's Motion in Limine (Dkt. 57). Both parties also filed objections to various trial submissions. Dkts. 67, 69. The Court will address some of these objections in addition to the Motions in Limine.

Having reviewed the record and briefs, the Court finds that the facts and legal arguments are adequately presented. Accordingly, in the interest of avoiding further delay, and because the Court finds that the decisional process would not be significantly aided by oral argument, the Court will decide the Motions without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B). For the reasons outlined below, the Court will GRANT in PART and DENY in PART SME's Motion in Limine and GRANT Arriwite's Motion in Limine. The Court also reserves ruling on most of the objections raised, but sustains Arriwite's objection as to prospective witnesses Kent Eden and Troy Hoffman.

## II. BACKGROUND

The facts of this case are well known to both parties and the Court will only include a brief recitation here for context.

Plaintiff Daniel Arriwite was employed as a welder by SME until his termination on July 3, 2015. On July 1, 2015, Arriwite was welding on one project when a superior asked him to move to a different project. As he began to work on the new project, Arriwite noticed that the weld was utilizing UltraCore 75C – Lincoln Electric Wire ("75C").[1] Based on his knowledge and experience in the industry, Arriwite knew 75C wire was a dangerous material that required additional safety measures and specialty equipment in order to safely use it under Occupational Safety and Health Administration ("OSHA") guidelines. Arriwite also knew that 75C wire could cause physical damage to the person using it if welded improperly.

Not seeing any of the requisite safety measures in the immediate area, Arriwite asked other employees where the Personal Protective Equipment ("PPE") was so that he could safely perform the task. Arriwite was provided a paper mask and a fan. He knew these measures were inadequate and expressed concern. He was told to simply return to the project he had previously been working on and was later sent home.

The following morning, on July 2, 2015, another SME employee asked to switch welders with Arriwite. Not seeing a need, Arriwite declined. Based upon this and other disagreements during the day, Arriwite was eventually summoned to SME's main office

---

[1] The parties previously represented to the Court that the wire in question was 70C wire—as opposed to 75C wire—and the Court's prior decision (Dkt. 36) utilized that reference. It is now the Court's understanding that the wire Arriwite was asked to use (and refused) was actually 75C wire.

and accused of insubordination.

SME Human Resource Director, Dave Burgess, and other employees were present during this meeting. Arriwite was given a direct order to go work on the project requiring 75C wire and told that all necessary safety precautions were in place in accordance with the Material Safety Data Sheet ("MSDS"). Arriwite refused, stating the MSDS was inadequate and that the manufacturer's warning label on the boxes of 75C wire outlined more detailed safety measures. SME told Arriwite the company followed the MSDS. Arriwite responded that OSHA required compliance with the manufacture's warning labels, not the MSDS, and that—if necessary—he would report SME to OSHA for safety violations.

At the conclusion of the meeting, SME sent Arriwite home for the day. Arriwite immediately went to the Shoshone-Bannock Tribes' Tribal Employment Rights Office and informed the safety compliance officer that he would likely be terminated the following day. He also filled out and sent an OSHA report detailing SME's unsafe use of 75C wire and the attending unsafe working conditions.

The next morning, July 3, 2015, Arriwite arrived at SME and began work. Shortly thereafter, he was again escorted to the main office and informed he was being let go. A discussion regarding unemployment benefits followed and Arriwite left the premises.

On July 14, 2015, Arriwite filed a whistleblower claim with OSHA. On July 15, 2015, OSHA investigated Arriwite's allegations. While the investigation yielded no violations, several employees informed Arriwite that SME had concealed its unsafe practices from OSHA during their visit. When Arriwite informed OSHA of this fact, OSHA

initiated a second unannounced site visit. During this subsequent visit, OSHA observed numerous code violations regarding the use of 75C wire. OSHA cited SME for these violations—designated as "SERIOUS" violations under OSHA standards—and proposed substantial fines. SME ultimately entered into a settlement agreement with OSHA for reduced penalties and stricter use of PPE.

OSHA later responded to Arriwite's whistleblower complaint and informed him there was insufficient evidence to suggest he had been terminated for refusing to work in dangerous conditions and/or for reporting those conditions to OSHA. Arriwite appealed. OSHA denied the appeal.

On December 7, 2018, Arriwite filed the instant action. In his Complaint, Arriwite brings four causes of action: 1) wrongful termination in violation of public policy; 2) negligent infliction of emotional distress; 3) breach of the covenant of good faith and fair dealing; and 4) wrongful discharge. Dkt. 1. After the close of discovery, SME filed a Motion for Summary Judgment. Dkt. 24. The Court held oral argument and subsequently issued a decision granting in part and denying in part SME's motion. Dkt. 36. The Court granted SME's request as to Claims II and IV, but denied SME's motion as to Claims I and III.

In anticipation of the upcoming trial, and pursuant to the Court's trial order (Dkt. 38), both parties filed motions in limine seeking to preclude certain evidence and testimony at trial. In its Motion, SME asks the Court to preclude all evidence and testimony as it relates to five topics. In his Motion, Arriwite asks the Court to find that testimony and evidence on two topics *is* admissible. Arriwite's two topics are identical to two of SME's

five topics, therefore, for organizational purposes, the Court will address the motions simultaneously.

### III. LEGAL STANDARD

"Motions in limine are well-established devices that streamline trials and settle evidentiary disputes in advance, so that trials are not interrupted mid-course for the consideration of lengthy and complex evidentiary issues." *Miller v. Lemhi Cty.*, 2018 WL 1144970, at *1 (D. Idaho Mar. 2, 2018) (citing *United States v. Tokash*, 282 F.3d 962, 968 (7th Cir. 2002)). "The term 'in limine' means 'at the outset.' A motion in limine is a procedural mechanism to limit in advance testimony or evidence in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009) (quoting Black's Law Dictionary 803 (8th ed. 2004)).

Because "[a]n in limine order precluding the admission of evidence or testimony is an evidentiary ruling," *United States v. Komisaruk*, 885 F.2d 490, 493 (9th Cir. 1989) (citation omitted) "a district court has discretion in ruling on a motion in limine." *United States v. Ravel*, 930 F.2d 721, 726 (9th Cir. 1991). Further, in limine rulings are preliminary and, therefore, "are not binding on the trial judge [who] may always change his mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000).

### IV. ANALYSIS

A. **Non-expert testimony regarding the risks and dangers of 75C wire**

   **Ruling: DENIED**

In its first request, SME asks the court to exclude all testimony regarding the risks and dangers of 75C wire *except* from properly designated expert witnesses. SME focuses

this request on two individuals: Arriwite and Tennys Madsen.

1. *Arriwite*

SME contends that, based upon his deposition testimony, Arriwite will try to testify about the risks and hazards of 75C wire and how he developed this understanding. In SME's mind, Arriwite should not be allowed to so testify because this "opinion" testimony would impermissibly cross over into expert testimony. The Court disagrees.

As the plaintiff in this case, Arriwite is allowed to testify regarding the facts that comprise this case, i.e. his "story." Central to that story is Arriwite's contention that it was *his* understanding that 75C wire was dangerous and that SME was not taking adequate precautions with employees who were using that specific type of wire. Arriwite can testify regarding his personal knowledge and understanding of the issues and how he came to the conclusions he did regarding the 75C wire. *Greene v. FedEx Kinko's Inc.*, No. 06-35715, 2007 WL 2915436, at *1 (9th Cir. Oct. 4, 2007) ("Personal knowledge is necessary for testimony to be admissible at trial under Federal Rule of Evidence 602."). SME will then have every opportunity to cross-examine Arriwite and challenge his conclusions, how he came to those conclusions, and whether his conclusions were reasonable. Critically, Arriwite's testimony regarding the 75C wire and his knowledge (whether perceived, real, accurate, or inaccurate) about the risks involved strikes at the heart of his claims as it establishes the basis for his refusal to do the tasks he was asked to do. Again, SME can cross-examine Arriwite regarding whether his understanding and actions were appropriate or supported, but the Court will not wholesale exclude his testimony on this basis.

In short, any challenges to Arriwite's testimony as it relates to the risks associated

with 75C wire go to the weight, not the admissibility, of the evidence. And to be sure, if questions on direct examination are not couched properly, SME can object as it sees fit.[2]

2. *Madsen*[3]

SME asks the Court to also preclude Tennys David Madsen from testifying on similar topics. Conversely, as part of his Motion, Arriwite asks that the Court allow Madsen to testify.

Madsen worked for SME around the same time as Arriwite and was fired a few months after Arriwite's termination. According to Arriwite, Madsen was terminated for almost the same reason he was terminated: refusing to use 75C wire. By contrast, SME argues that Madsen was fired for numerous other reasons and that his testimony will not aid the jury in this case.

As the Court has noted previously, the briefing in this case has been concise—to put it kindly. *See* Dkt. 36, at 5; 5 n.2. Here too, SME's original argument in support of its request to exclude Madsen was relegated to a footnote and a passing line that his testimony was similar to Arriwite's and that it "lacks foundation, is unreliable, and should be excluded." Dkt. 56-1, at 3. In response to Arriwite's request that Madsen's testimony be admitted, SME minimally fleshed out its objections by arguing that Arriwite has misconstrued Madsen's testimony and that his (Madsen's) termination had little to nothing

---

[2] For example, asking about Arriwite's *personal* experience, *personal* observations, or *personal* knowledge would likely be appropriate. If any question (or answer) begins to delve into matters only an expert can opine on, SME can object, and the Court will rule at that time.

[3] The admissibility of Madsen's testimony is the subject of one of Arriwite's requests in his Motion in Limine. Dkt. 57-1, at 3–4.

MEMORANDUM DECISION AND ORDER - 7

to do with any refusal to weld with 75C wire. Despite this brevity, SME thankfully included Madsen's deposition transcript. Dkt. 59-1. The Court has reviewed Madsen's testimony and, while it is true that Madsen's purported refusal to weld with 75C wire was not the sole cause of his termination, it does appear to have played a role in SME's decision to fire him.

The similarities between Arriwite's firing and Madsen's firing a few months later render Madsen's testimony relevant. Arriwite alleges in this case that SME terminated him in violation of public policy for raising safety concerns. Madsen has asserted (not in a lawsuit, but in his sworn testimony) that he was terminated, at least in part, for the same reason. SME contends that neither were terminated for failure to use 75C wire as directed but because of insubordination (Arriwite) and poor performance (Madsen).

Regardless, because the matters are factually connected and appear relevant, the Court will allow Madsen to testify.[4] SME will, of course, be given time to cross-examine Madsen and delve into his testimony.[5] And any specific objections can be raised, and dealt with, during his testimony.

B. **Evidence Respecting Damages in excess of $228,449**

**Ruling: DENIED**

As part of expert discovery in this case, Arriwite produced an expert report from Tyle Bowles indicating Arriwite suffered approximately $228,449 in lost wages (with

---

[4] Thus, to the extent the Motions are treated independently, Arriwite's Motion on this matter is GRANTED.

[5] SME argues that if the Court decides to let Madsen testify, it should nonetheless preclude him from testifying as to the "qualities, safety, or dangers of 75C wire" because he is "not an expert" and has "limited knowledge" on the subject. Dkt. 59, at 5. Consistent with its ruling above with respect to Arriwite, the Court will allow Madsen to testify regarding his personal knowledge and SME can make any specific objections it believes are warranted.

MEMORANDUM DECISION AND ORDER - 8

associated tax adjustments) as a result of SME terminating him. Bowles' calculation began at the time of Arriwite's termination and ended in December 2020, and was based on Arriwite's anticipated line of work and an assumption that he would have worked until age 67 but for the termination.

SME first takes issue with any efforts to add to the calculation at this late stage arguing the Court should "cap" Arriwite's damages at the previously disclosed amount. The Court is unpersuaded by this argument. Arriwite notes he retained Bowles many years ago and asked him to calculate damages through December 2020 assuming this case would go to trial by that time. That obviously has not happened. Thus, it would be appropriate for Bowles to supplement his report and for Arriwite to then update his claim to reflect a more current and accurate calculation.[6]

To be sure, the Court understands SME's broader contention that Arriwite had a duty under Rule 26 to supplement his calculations long before trial. And while Arriwite likely could (or should) have supplemented prior to SME raising the issue in a motion in limine, his failure to do so does not warrant exclusion of any updated amount. As the Court has recently reiterated, the whole purpose of Rule 26 as it relates to damages is to keep the defendant apprised of the plaintiff's claims and damages. Furthermore, supplementation (even after the close of discovery) is allowed. *See, e.g., Ice Castles, LLC v. LaBelle Lake Ice Palace LLC*, 2021 WL 4138398, at *3 (D. Idaho Sept. 10, 2021); *Idahoan Foods, LLC*

---

[6] Although, unless the Court is mistaken, this supplementation should be fairly minor. If Arriwite alleges he would have worked until age 67, and he turned 67 in March of 2021, any supplementation would be a matter of added a few more months—from December 2020 to sometime in 2021—to Bowles' calculation. Thus, SME can hardly say the "new" calculation will severely catch it off guard.

MEMORANDUM DECISION AND ORDER - 9

*v. Allied World Assurance Co. (U.S.), Inc.*, 2020 WL 1948823, at *6 (D. Idaho Apr. 22, 2020).

SME's second concern is that Bowles incorrectly calculated Arriwite's prospective earnings beyond age 65 (the normal retirement age), but more importantly, past age 62—when Arriwite actually retired. Again, these arguments go to the weight of Bowles' report. Questions concerning the reasonableness of Bowles' calculations are fodder for cross-examination, but do not require a pre-trial ruling as to any "cap" on damages.

## C. **Evidence of OSHA Complaints and Inspections**[7]

**Ruling: DENIED (with withheld ruling on some unanswered questions)**

On July 7, 2015, following his termination, Arriwite filed a whistleblower complaint with OSHA. His complaint was ultimately denied, as was his subsequent appeal. Another complaint, however, resulted in an OSHA site inspection of SME facilities on July 15, 2015. That investigation resulted in various citations. SME seeks to have all of this evidence excluded on the basis that it is irrelevant, contains hearsay, and would be unduly prejudicial. In contrast, Arriwite contends the OSHA complaint, the investigation, and its findings are all relevant to show SME's general behavior towards safety and to illustrate why he took the actions he did that resulted in his termination.

### 1. *Relevance*

The relevancy of the OSHA documents/investigation is difficult to ascertain because there is a factual dispute embedded within the materials. Arriwite refused to weld

---

[7] This is the subject of one of Arriwite's requests in his Motion in Limine. Dkt. 57-1, at 2–3.

MEMORANDUM DECISION AND ORDER - 10

with 75C wire. The OSHA reports outline that SME was cited for violations stemming from improper use of 70C wire. Dkt. 57-2, at 9–10. However, SME's designated 30(b)(6) deponent, Robert Moffat, has testified that it was in fact 75C wire that was in use and observed during the OSHA investigation. Dkt. 60-2, at 3-4. Thus, either the OSHA report has a typo or Moffat's recitation is incorrect.

Arriwite argues that notwithstanding this discrepancy, the reports are still relevant because they show SME was "in violation of OSHA safety and health regulations immediately before, during, and after [his] termination. . . ." Dkt. 60, at 6. SME comes back in its reply and takes full hold of the discrepancy, arguing that while the records may be admissible under various rules of evidence (which will be discussed in the following section), the reports should be thrown out altogether because, under Federal Rule of Evidence 803(8)(B), the discrepancy renders the records unreliable and contends that "if the author of the letter misstated the type of wire, how can we assume mistakes were not made in other areas?" Dkt. 68, at 4.

The Court does not know if there is a mistake or not. In fact, a careful review of Moffat's testimony illustrates that both propositions may be correct. Plaintiff's counsel's specific question to Moffat was whether "that wire (75C) [was] being welded with when they (OHSA) tested the air quality," to which Moffat replied "yes." Dkt. 60-2, at 3. Later in the deposition, when discussing OSHA's findings that SME had exceeded certain exposure limits that were unsafe to breath, Plaintiff's counsel asked whether "75C emit[s] all of those things," to which Moffat replied: "Yes. Most all your weld wires are going to emit those." *Id*. Neither statement forecloses the possibility that *both* 70C and 75C wire

MEMORANDUM DECISION AND ORDER - 11

were being used during the OSHA investigation. Thus, the report *and* Moffat's testimony could be accurate. The Court, at this point, simply doesn't know.

That said, the Court tends to agree with Arriwite that even assuming, arguendo, that the type of wire observed during the OSHA inspection was different than the type of wire he refused to weld with prior to his termination, such would not automatically mean the reports and findings must be excluded; only that their relevancy is diminished. As will be explained below, the Court finds SME's other arguments unpersuasive and there are other, independent reasons the reports are admissible.

Thus, the Court's sole lingering concern is the discrepancy between Moffat's testimony and the reports. Prior to the introduction of the reports, the Court will hold a brief hearing outside the presence of the jury in which Arriwite will be required to make a proffer of proof illustrating that either 1) there is a typo in the report, or 2) the report and Moffat's testimony are not incongruent. Calling Moffat to the stand during this proffer will likely be necessary. Again, the Court finds that, at a minimum, the records *are relevant* and *can* be admitted in their native form. The only remaining question then, is the degree to which the parties can elaborate on the documents—either via testimony or through argument.

### 2. Hearsay

As just noted, the Court finds the records can be admitted. This finding is based upon Federal Rule of Evidence 403 and 803(8)(A). SME argues that the OSHA documents constitute hearsay. Arriwite disagrees, and contends he does not seek to introduce these documents to prove the "truth of the matter asserted," but rather to illustrate "that SME

was demonstrably in violation of OSHA safety and health regulations immediately before, during, and after [] [his] termination, putting [him] and many other welders at risk of occupational injury and harm to their health and safety." Dkt. 60, at 6.

First, Arriwite is incorrect. He *is* seeking to introduce these reports for the truth of the matter asserted (i.e. that SME violated OSHA standards). That said, as will be explained, an exception to the hearsay rule applies and renders the materials admissible.

Second, however, the Court will not let Arriwite stray too far afield with these records. SME is not on trial for OSHA violations. Neither is it on trial for its behavior towards other employees. Could the jury benefit from some brief testimony and argument on those two topics? Yes. Each informs Arriwite's actions (and SME's actions) at the time SME terminated Arriwite. Nevertheless, the Court will not allow the introduction of the OSHA reports/investigation to turn this trial into a hearing about SME's overall OSHA compliance.

The exception that applies in this case rendering the hearsay materials admissible is Rule 803 which outlines that if the evidence is: "a record or statement of a public office [that] (A) [] sets out: (i) the office's activities; (ii) a matter observed while under a legal duty to report . . .; or (iii) in a civil case . . . factual findings from a legally authorized investigation" it is not hearsay. Fed. R. Evid. 803(A).

In this case, SME admits that the records are "arguably admissible under [Rule 803(A) and (B)]" but lack foundation. The Court shares some of SME's concerns about foundation; however, it cannot rule on that specific objection at this time and must wait to hear the testimony and evidence. This concern aside, because these records constitute the

MEMORANDUM DECISION AND ORDER - 13

"factual findings from a legally authored investigation" by a public office, they are *not* hearsay and, at the very least, can be admitted into evidence on their own.

And to be sure, if, during Arriwite's proffer, the Court cannot determine the accuracy of the records, SME may renew its argument that under Rule 803(8)(B), the documents "indicate a lack of trustworthiness" and the Court may reconsider its ruling of admissibility at that time.

### 3. Prejudice

Finally, SME argues that this evidence should be excluded based upon the potential for prejudice, confusion, and waste of time. This argument relates back to SME's contention that the report and investigation were concerned with 70C wire as opposed to 75C wire. Again, the Court will flesh out this discrepancy prior to any argument before the jury on these topics, but, regardless of the breadth and depth to which the Court will allow any witness to testify on these matters, any prejudice to SME will be limited. Even if the reports detail a different type of wire used by a different welder on a different day, the fact remains that SME was found to be in violation of OSHA standards as applied to welding materials. That is relevant to this case. Arriwite claims that his disagreement with SME's approach to safety, or lack thereof, was the driving force behind his termination. And if SME has grave concerns about any particular testimony, the Court may entertain a request to give a limiting jury instruction on the matter.

In sum, the OSHA complaint, inspections, and results will not be excluded at this time. The Court will tailor this ruling as necessary during trial.

### D. Ray Roberts[8] Incidents

SME's final two request are related. Ray Roberts was a co-worker of Arriwite's at SME. In fact, it appear Roberts may have had some supervisory duties over Arriwite while the two worked at SME. Interestingly, however, Arriwite and Roberts had previously worked together at a prior employer. Their relationship—at SME and when working for the prior employer—is the basis of SME's final two requests.

#### 1. Roberts' prior employment

**Ruling: GRANTED**

During the pendency of this litigation, Arriwite has referenced the fact that Roberts was terminated from their mutual former employer—Virginia Transformer Company ("VTC")—for engaging in workplace violence. SME argues any testimony as to this situation should be excluded. The Court agrees. There is no indication that Arriwite was involved in the circumstances surrounding Robert's termination from VTC. Additionally, that Roberts was terminated for workplace violence has no bearing on the present issues.

Arriwite contends that the fact that "SME chose to employ Roberts given [his past] . . . is indicative of the general attitude of SME towards the protection, heath, and safety" of its employees. Dkt. 60, at 8. The Court disagrees. Arriwite's attempts to impute Roberts' (allegedly) bad character to SME is irrelevant and unnecessary. Roberts is not on trial in this case. Neither are SME's hiring practices. In short, Roberts' prior termination from VTC is irrelevant and may not be introduced into evidence.

---

[8] SME states that this individual's real name is Ray Carlson. The Court will use the name provided by Arriwite (Ray Roberts).

MEMORANDUM DECISION AND ORDER - 15

   2. *Altercation at SME*

**Ruling: GRANTED in PART, DENIED in PART**

Next, SME argues the Court should exclude any reference to a physical altercation between Arriwite and Roberts on July 2, 2015—the day before Arriwite was terminated. SME contends that because Arriwite has clarified he was not physically injured during the fight, there is no reason to bring up this incident. For his part, Arriwite claims that while he has disavowed any physical injury, he should be permitted to introduce this testimony, again, to illustrate SME's "attitude of forcing their employees to engage in [unsafe working conditions]." Dkt. 60, at 8.

Again, the Court struggles to see the connection Arriwite is trying to make. SME is not on trial for its *general* hiring practices or its *general* "attitude" towards health and safety. The questions in this case go to Arriwite's behavior as an employee and SME's behavior *as applied* to Arriwite. To that extent, Arriwite can testify that he and Roberts had an altercation on July 2, 2015. He can say that he and Roberts had a poor relationship or prior bad experiences together,[9] however, there is no need to delve into the details of the altercation—or to expound on what amounts to simply bad character evidence of Roberts—*unless* Arriwite can tie those details to the specific causes of action in this case.

In short, the Court will allow some generic testimony about the altercation to come into evidence, but will preclude irrelevant details.

---

[9] Arriwite will not be permitted to reference Roberts' termination from VTC.

MEMORANDUM DECISION AND ORDER - 16

### E. Other Pre-trial Matters

Finally, each party filed objections to the other side's trial submissions. Dkts. 67, 69. While some of these objections can only be taken up at trial, the Court will comment briefly on some of SME's objections which interact with its decision today, as well as one of Arriwite's objections that appears to require attention prior to trial.

#### 1. *SME's Objections (Dkt. 67)*

In its Motion, SME objects to the introduction of any documents or evidence related to the OSHA complaints and reports. Dkt. 67, at 2. In accordance with the Court's decision today, those documents are not wholesale excluded on the bases of hearsay or relevance. Arriwite will have to comply with all evidentiary rules in admitting this evidence, and other objections may yet apply;[10] however, on the whole, the Court finds these documents admissible.

SME objects to any testimony from Arriwite and Madsen that bleeds over into expert testimony. *Id.* The Court addressed this above. Specific objections can be raised at trial if appropriate.

Finally, SME objects to any testimony from Bowles related to Arriwite's inability to find work as that was not covered in his expert report and reaffirms that his testimony should be limited to what was disclosed in his report. Relatedly, SME objects to any testimony from Debra Nims regarding "toxic fumes," and the composition of 75C wire, as neither were included in her expert report. As a fundamental matter, the Court agrees that

---

[10] As explained, the Court itself has some lingering concerns that will need to be addressed as it relates to this evidence.

an expert may only testify consistent with his or her expert report. The extent of their testimony, however, can only be evaluated in the moment; thus, the Court cannot definitively rule on the scope of Bowles or Nims's testimony at this time.

2. *Arriwite's Objections (Dkt. 69)*

In response to SME's trial submissions, Arriwite objects to SME calling Kent Eden and Troy Hoffman as witnesses in this case. Under the circumstances, the Court must agree and will prohibit either from testifying.

On August 27, 2019, SME served its initial disclosures on Arriwite. Dkt. 69-1. Neither Eden nor Hoffman were listed as individuals with knowledge of the case. *Id.* at 2–3. On October 10, 2019, SME responded to Arriwite's First Set of Interrogatories, Interrogatory No.1 (requesting all of its witnesses), but did not disclose Eden or Hoffman. Dkt. 69-2, at 5. Despite this, SME recently listed Eden and Hoffman as prospective trial witnesses. Dkt. 61, at 2, 3.

It is within the Court's discretion to exclude previously undisclosed witnesses from testifying at trial. Federal Rule of Civil Procedure 26(a)(1)(A)(i) requires a party to disclose: "the name and, if known, the address and telephone number of each individual likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses." If a party fails to provide information or identify a witness as required by the rules, the party is not allowed to use that information or witness to supply evidence at trial, unless the failure was substantially justified or is harmless. Fed. R. Civ. P. 37(c)(1). *Miesen v. Hawley Troxell Ennis & Hawley LLP*, 2021 WL 1124758, at *1 (D. Idaho Mar. 24, 2021), *reconsideration denied*, 2021 WL 3112356 (D. Idaho July 22, 2021).

Here, it appears clear SME failed to make the required disclosure of Eden and Hoffman as persons with knowledge under Rule 26(a)(1)(A)(i) by the appropriate deadline. As a result, Arriwite has been deprived of the opportunity to depose either person, and/or to serve additional discovery requests to determine if the witnesses have potentially relevant information. Accordingly, the Court sustains the objection and will not allow Eden and Hoffman to testify.[11]

## V. CONCLUSION

In sum, the Court will allow Arriwite and Madsen to testify as to matters within their personal knowledge. Specific objections can be raised at trial.

The Court will allow Bowles to update his expert report (and will require that Arriwite supplement his disclosure as to damages) to reflect the most up-to-date damages at issue. This update and supplementation shall occur on or before October 20, 2021.

The Court will allow the OSHA complaints, investigations, and findings into evidence subject to appropriate foundation, and in accordance with its concerns outlined above.

The Court will not allow any evidence or testimony regarding Roberts' prior employment problems, but will allow limited testimony regarding his altercation with Arriwite at SME.

---

[11] Now, as part of the briefing process, SME has not been provided an opportunity to respond to Arriwite's objection. Under Rule 37(c)(1), if a party shows their failure to disclose was "substantially justified or [] harmless," the party *may* be allowed to use the information/witness. If it so desires, SME may file a short brief, not to exceed 5 pages, explaining why the Court should reconsider its ruling as it relates to these two witnesses. Any such brief should be filed on or before October 15, 2021.

Finally, Eden and Hoffman will not be allowed to testify at trial. SME can seek reconsideration of this ruling pursuant to the Court's instructions in footnote 11.

As always, the Court's rulings on these motions are interlocutory. Depending on how certain evidence is presented at trial, the Court may reconsider any of its rulings.

## VI. ORDER

IT IS HEREBY ORDERED:

1. SME's Motion in Limine (Dkt. 56) is GRANTED in PART and DENIED in PART as outlined above.

2. Arrwite's Motion in Limine (Dkt. 57) is GRANTED under the terms and conditions outlined above.

3. The Court withholds ruling on the majority of the parties' objections (Dkts. 67, 69), however, it will sustain Arriwite's objection to Eden and Hoffman being called to testify in light of SME's failure to disclose either as a witness.

DATED: October 6, 2021

David C. Nye
Chief U.S. District Court Judge